Argued and submitted March 12, affirmed April 4, 2001

# William HOLDNER
## and Randall Holdner, dba Holdner Farms,
### *Appellants,*

*v.*

## OREGON TROUT, INC.,
### a nonprofit Oregon corporation,
### *Respondent,*

*and*

## Jim MYRON,
### *Defendant.*

### (982482; CA A107619)

22 P3d 244

Jeffrey B. Wilkinson, James Clark Prichard, and Stewart Sokol & Gray, LLC, filed the brief for appellants.

Christopher T. Carson argued the cause for respondent. With him on the brief were James P. Laurick, Gregory B. Snook, and Kilmer, Voorhees & Laurick, P.C.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Plaintiffs initiated this action for defamation, intentional interference with prospective business advantage, and intentional infliction of emotional distress arising out of statements that defendant Oregon Trout, Inc. (Oregon Trout), made to its members about plaintiffs' business practices. The trial court entered summary judgment in favor of Oregon Trout on all claims. Plaintiffs appeal, assigning error in several respects to the entry of summary judgment on the defamation claim. We affirm.

The following facts are not in dispute. Plaintiffs own and operate Holdner Farms, a cattle operation located along Scappoose Creek, which ultimately drains into the Columbia River. Oregon Trout is a nonprofit organization that describes its mission as protecting and restoring native wild fish and their ecosystems. It has in excess of 4,000 members. Oregon Trout publishes a newsletter, "The Riverkeeper," and regularly mails copies of it to its members.

On September 5, 1997, Oregon Trout sent the September 1997 edition of "The Riverkeeper" to its members. That edition contained an article concerning certain business practices of Holdner Farms:

> "In early January of this year an Oregon Trout Riverkeeper volunteer on the South Fork of Scappoose Creek caught Oregon Trout's attention with stories of chronic water quality violations by a feedlot along the creek. Several community members confirmed the Riverkeeper's concerns with testimony of dead cattle being dumped into the creek, constant runoff from manure pits, silage seeping into nearby tributaries, and even illegal water diversions.

> "Upon investigation Oregon Trout learned William Holdner, an accountant, owned the property. As local testimony indicates, Mr. Holdner purchased the property ten years ago and immediately built a small diversion dam and redirected a small tributary into a culvert placed under a concrete slab that serves as a silage pit near the loafing shed he erected. Unfortunately for steelhead, this small tributary was a prime nursery stream. Spawners can no longer travel up this stream because the culvert he placed

sits 4-5 feet above the water on the mainstream of the South Fork.

"To make matters worse Mr. Holdner began to use the site as a confined animal facility (feedlot) for over four months out of the year. During the wet winter months, 250-300 Hereford cattle were being confined to approximately three acres that straddle the South Fork. Each winter the lot becomes a wet, muddy bog with almost 200 yards of streambank decimated by erosion and runoff. A visit to the area one rainy day provided ample reason to check on Mr. Holdner's track record.

"A call to the Oregon Department of Agriculture revealed that Mr. Holdner was adamant that he was not subject to Confined Animal Facility Operating Standards (CAFOS). The Department investigated the site and found that the facility was contributing fecal coliform pollution to the stream but not in such a great quantity as to cause violation of water quality standards. Much to the Department's credit, they did not rest their case. After seeking an opinion from the Attorney General, they concluded that Mr. Holdner was in violation of the Clean Water Act because his operation discharges wastewater to surface waters of the state. Therefore, the operation would be required to get an NPDES (National Pollution Discharge Elimination System) Permit or comply with CAFO requirements.

"On July 15, 1997 the Department of Agriculture sent Mr. Holdner a letter requesting that he comply with CAFO Standards and eliminate his operation's pollution to Scappoose Creek. The facility has 30 days to comply or be subject to daily fines. At publication we were unable to confirm if the operation has complied."

Early in October 1997, plaintiff William Holdner (Holdner) heard rumors about an "environmental group" spreading information that Holdner Farms operated a feedlot and that it polluted streams by burying dead cows in the streams and allowing cattle waste to drain into the stream. On October 10, 1997, Holdner received a telephone call from an employee of the Port of Vancouver with whom he had been negotiating a lease. The employee mentioned the Oregon Trout article and attempted to send a facsimile copy to Holdner, but the copy was not legible.

On October 16, Holdner called Oregon Trout. He spoke with Jason McKain, an employee, for approximately 20 minutes. He expressed displeasure with the article and its contents. He referred specifically to the characterization of his property as a feedlot and to the statements in the article that dead cattle were being dumped into the creek, that manure was being carried into the creek by runoff, and that silage was seeping into tributaries of the creek. McKain reported the conversation to Steve Hinton, another employee and the author of the article.

Later that same day, Hinton called Holdner, who gave Hinton "a resounding ear full." Holdner told Hinton that Holdner Farms was in compliance with environmental regulations, that it uses no pesticides or manufactured fertilizers and uses instead only organic manure on the fields, that it never discharges into Scappoose Creek, and that the Department of Agriculture's tests were inaccurate because the sampling was flawed. When Hinton attempted to explain his position, Holdner called him a liar, but offered Hinton "a break" if he would reveal his sources so that Holdner could sue them.

On October 24, 1997, Holdner received a copy of the article by hand delivery from the Port of Vancouver.

On October 20, 1998, plaintiffs filed their complaint against Oregon Trout, alleging that the publication of falsehoods in the September 1997 issue of "The Riverkeeper" caused damage to Holdner Farms. The specific falsehoods about which plaintiffs complained were that:

"a. Holdner Farms causes chronic water quality problems along the creek adjoining Holdner Farms;

"b. Holdner Farms operated a feedlot;

"c. Holdner Farms allowed or dumped dead cattle in the creek;

"d. Holder Farms caused constant runoff from manure pits located on Holdner Farms;

"e. Holdner Farms caused or allowed silage to seep into tributaries;

"f.  Holdner Farms[ ] constructed [ ] an illegal diversion structure[.]"

Oregon Trout moved for summary judgment on the ground that the action was time barred. According to Oregon Trout, the statute of limitations for defamation actions is one year from the date of publication, and plaintiffs filed their complaint over one year from the date that the September 1997 issue of "The Riverkeeper" was mailed. Plaintiffs opposed the motion on the ground that the one-year statute of limitations should not begin to run until the defamation has been discovered. According to plaintiffs, Holdner did not fully understand the precise nature of the statements contained in the article until October 24, 1997, when he received a copy of it. That date, plaintiffs argued, was less than one year prior to the filing of the complaint. Oregon Trout replied that a discovery rule for defamation claims applies only when the alleged defamation is confidential, and the article at issue in this case was not confidential. In any event, it argued, the uncontradicted evidence shows that Holdner knew about the article and its contents in detail by October 16, 1997, when he called Oregon Trout and attempted to persuade two of its employees that the article was incorrect and threatened to sue its sources for the errors.

The trial court ruled that the discovery rule for defamation claims applies only to confidential publications that are inherently nondiscoverable in the exercise of due diligence. The court ruled that, in this case, an article that was mailed to 4,000 persons around the state was not confidential, nor was it inherently nondiscoverable. In the alternative, the court ruled that, even if the discovery rule applied, the undisputed evidence shows that Holdner was aware of the article and its contents more than one year before the filing of the complaint. Accordingly, the court allowed the motion and dismissed the claim.

■ On appeal, plaintiffs argue that the trial court erred in ruling that the discovery rule for defamation actions does not apply to this case. They argue that, in fact, the article was "confidential" because it was mailed only to members of a private organization and not to members of the public generally. They argue that the trial court further erred in concluding

that the undisputed evidence showed that Holdner had discovered the contents of the article more than one year before filing. According to plaintiffs, the evidence shows that Holdner "did not discover the exact content" of the article until he obtained a copy of it on October 24, 1997, less than one year from the filing of the complaint.

■　In reviewing the trial court's decision, we examine the record to determine whether there is a genuine issue of material fact and, if not, whether Oregon Trout is entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1997).

The "discovery rule" is a judicially created concept first endorsed in Oregon in *Berry v. Branner*, 245 Or 307, 421 P2d 996 (1966). In that medical malpractice case, a physician left a surgical instrument in the plaintiff's body, but the instrument was not discovered until nine years later. The court held that the two-year statute of limitations that ordinarily applied to such actions did not begin to run until the plaintiff discovered or reasonably could have discovered the tort committed upon her by the defendant. *Id.* at 316.

Since *Berry*, the rule has been applied to statutes of limitations applicable to other types of actions. *See, e.g., Frohs v. Greene*, 253 Or 1, 452 P2d 564 (1969) (negligent medical diagnosis); *Adams v. Oregon State Police*, 289 Or 233, 239, 611 P2d 1153 (1980) (actions under Oregon Tort Claims Act). It also has been legislatively codified with respect to medical negligence actions. ORS 12.110(4).

In at least one case, the discovery rule was held to apply to defamation actions. In *White v. Gurnsey*, 48 Or App 931, 935-36, 618 P2d 975 (1980), this court held that a claim for defamation based on statements made in a confidential memorandum did not accrue until the plaintiff discovered its contents. In contrast, in *Workman v. Rajneesh Foundation International*, 84 Or App 226, 231, 733 P2d 908, *rev den* 303 Or 700 (1987), we held that a discovery rule did not apply to defamatory statements made in a public meeting that the plaintiff did not attend, because it was highly likely that the comment would rapidly come to the attention of its subject.

■    Plaintiffs urge us to conclude that the article in "The Riverkeeper" was like the confidential memorandum in *White*, while Oregon Trout argues that the article was as readily discoverable as the statements made in *Workman*. It is an interesting question, but one that we need not address, for even if plaintiffs are correct that the discovery rule applies to this case, the undisputed facts demonstrate that their claim was "discovered" more than one year before "filing." In general terms, the discovery rule provides that a claim does not accrue until it has been discovered or, in the exercise of reasonable care, should have been discovered. *FDIC v. Smith*, 328 Or 420, 428, 980 P2d 141 (1999). More specifically, a claim is "discovered" when the plaintiff has a reasonable opportunity to become aware of three things: (1) harm; (2) causation; and (3) tortious conduct. *Gaston v. Parsons*, 318 Or 247, 255, 864 P2d 1319 (1994). In that regard, the Supreme Court has cautioned that

> "[a] plaintiff does not need to know to certainty that each particular element exists. The discovery rule is designed to give plaintiffs a reasonable opportunity to become aware of their claim. Actual knowledge that each element is present is not required. * * * Therefore, the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements (harm, causation, and tortious conduct) exists."

*Id.* at 255-56 (citation omitted). The question whether a plaintiff knew or should have known each element is a question of fact. *Id.* at 256.

Under ORS 12.120(2), "[a]n action for libel or slander shall be commenced within one year." Assuming for the sake of argument that the discovery rule applies to defamation actions such as this one, the question thus is whether there is an issue of fact whether Holdner actually knew of Oregon Trout's alleged defamation or, in the exercise of reasonable care, should have known of it more than one year from the date of the filing of the complaint.

On that question, the evidence is undisputed. Even assuming, for the sake of argument, that Holdner was on

notice of the article on October 10, 1997—when he received the call from the Port employee—he had actual knowledge of the offending article, its authorship, and its contents on October 16, 1997. On that date, Holdner telephoned two Oregon Trout employees to complain about the publication of the article and to contest its contents. Specifically, Holdner contested the article's characterization of his farm as a "feedlot" and complained that it was simply incorrect in asserting that dead cattle had been dumped into the creek, that recent testing had shown the farm to have contributed to water quality problems, and that manure and silage had washed from the farm to the creek. Indeed, Holdner insisted that the author of the article reveal his sources so that Holdner could initiate legal proceedings against them. Thus, the undisputed evidence is that Holdner actually knew of the article, its contents, its authorship, and its damaging nature at least one year and four days before the filing of the complaint.

Plaintiffs contest none of the foregoing. Their arguments are that summary judgment nevertheless should not have been granted because: (1) the issue is one of fact and (2) what Holdner knew was insufficient to trigger the statute of limitations, given his testimony that he did not know the "exact content" of the article until later.

■■ We find neither argument to be persuasive. To begin with, although the question whether a plaintiff has discovered a claim is one of fact, resolution by summary judgment is appropriate when the uncontroverted evidence shows that the discovery has occurred. *Dew v. DeJong*, 105 Or App 256, 259 n 1, 804 P2d 505, *rev den* 311 Or 426 (1991). Moreover, as a matter of law, it does not matter that Holdner did not know the "exact content" of the article. As the Supreme Court explained in *Gaston*, it is not necessary that a plaintiff know "to certainty" the precise nature of the claim. 318 Or at 255. In this case, it is undisputed that Holdner had actual knowledge of substantially all of the content of the article. That is sufficient to trigger the statute of limitations. The trial court therefore did not err in entering summary judgment on the defamation claim.

Plaintiffs advance other assignments of error, which we reject without further discussion.

Affirmed.